**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CAPSTONE ASSOCIATED** | § | |
| **SERVICES, LTD., et al.,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | **CIVIL ACTION NO.: 4:14-cv-00768** |
| **vs.** | § | |
| | § | |
| **GARY McNELLEY, et al.,** | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANTS MARKET HEALTH, INC., GARY MCNELLEY, DAVID RIVERO, MH EXPORT CORP., NUTRITION CASUALTY CORP., AND SOLUTION CASUALTY CORP.'S BRIEF IN SUPPORT OF MOTION TO VACATE ARBITRATION AWARD OR ALTERNATIVE MOTION TO MODIFY ARBITRATION AWARD**

# TABLE OF CONTENTS

I.     NATURE & STAGE OF PROCEEDINGS .......................................................4

II.    FACTUAL BACKGROUND .................................................................5

     A.     The Parties and Their Agreements ...........................................5

     B.     PoolRe & the Feldman Entities' Reinsurance Obligation ......................6

     C.     The Contractual Disputes ..................................................9

III.   STATEMENT OF ISSUES AND STANDARD OF REVIEW .......................................12

IV.    JURISDICTION & VENUE .................................................................14

V.     SUMMARY OF THE ARGUMENT .............................................................14

VI.    ARGUMENT & AUTHORITY .................................................................15

     A.     The Arbitrator Entered the Award without Requisite Authority. ...........................15

     B.     The Arbitrator Exceeded His Authority and Invaded Judicial Province by Deciding the Validity of the Arbitration Provision and the Existence of Party Contracts. ......................................................................18

     C.     The Market Health Entities did not waive their objections to the validity and applicability of the underlying arbitration provision. ....................................20

     D.     The Arbitrator Created His Own Law on Declaratory Judgments to Facilitate a Higher Fee Award to the Feldman Entities. ........................................22

     E.     The Arbitrator's Demonstrated Evident Partiality for the Feldman Entities Warrants Vacatur. ............................................................23

           1.     Legal standard ...............................................24

           2.     The Arbitrator's failure to disclose CRS's significant business relationship with the Feldman Entities constitutes evident partiality. .............................................................25

           3.     The Arbitrator's biased pre-evidence statements constitute evident partiality. .............................................................27

           4.     The Arbitrator ignored uncontroverted admissions to generate a one-sided Award. ......................................................29

5.      The Arbitrator based his Award on "evidence" that does not exist. ........... 30

6.      The Arbitrator relied on inadmissible expert testimony. ........................... 32

      a.      McCormack was a grossly biased fact witness in the underlying dispute.       32

      b.      McCormack's opinions were based on an unreliable foundation.       33

      c.      McCormack's opinions at the Hearing contradict representations he made to the State Bar of Texas on Feldman's behalf in 2005-06.       33

7.      The Arbitrator's conclusion that the Market Health Entities' legal malpractice expert did not testify on the standard of care is patently wrong and exhibits the Arbitrator's failure to consider all evidence. ........ 36

8.      Conclusion: the Arbitrator was evidently partial. ...................................... 37

F.      The Arbitrator Exceeded His Authority and Did Not Issue a Mutual, Final, and Definite Award. ......................................................................................... 37

1.      The arbitrator improperly awarded attorney's fees for causes of action upon which the Firm lost ................................................................. 38

2.      The arbitrator improperly awarded attorney's fees for causes of action the Firm did not bring. ................................................................. 39

3.      The Arbitrator improperly entered relief against individuals and entities that were not parties to the arbitration proceeding. ...................... 39

4.      The Arbitrator granted relief against parties with no liability. ................. 40

VII.      CONCLUSION & PRAYER ......................................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

2014 WL 1320188 (S.D. Tex. Mar, 31, 2014) ............................................................................................ 25

Abor v. Black,
    695 S.W.2d 564 (Tex. 1985) ....................................................................................................21

Americo Life, Inc. v. Myer, No. 12-0739,,
    --- S.W.3d ----, Slip Op. (Tex. June 20, 2014) ....................................................................14

Ballantine Books,
    302 F.2d 17 ............................................................................................................................ 27

Brabham v. A.G. Edwards & Sons, Inc.,
    376 F.3d 377 (5th Cir. 2004) ................................................................................................ 12

Buckeye Check Cashing, Inc. v. Cardegna,
    546 U.S. 440 (2006) .............................................................................................................. 19

Burlington N. R.R. Co. v. TUCO, Inc.,
    960 S.W.2d 629 (Tex. 1997) ............................................................................... 23, 24, 36

Citicorp Admin. Services, Inc. v. Mail Sort, Inc.,
    4:04-CV-223-A, 2004 WL 962832 (N.D. Tex. May 4, 2004) ............................................ 17

Commonwealth Coatings Corp. v. Continental Cas. Co.,
    393 U.S. 145 (1968) .............................................................................................................. 23

ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Union,
    741 F.3d 627 (5th Cir. 2014) ................................................................................................ 20

Davis v. Prudential Secs., Inc.,
    59 F.3d 1186 (11th Cir. 1995) .............................................................................................. 38

Ex. 4 and,
    4-A - 4 ...................................................................................................................................... 9

Fairchild & Co., Inc. v. Richmond, F. & P. R. Co.,
    516 F. Supp. 1305 (D.D.C. 1981) ........................................................................................ 27

Granite Rock Co. v. Int'l Broth. of Teamsters,
    561 U.S. 287 (2010) ......................................................................................................... 17, 18

Hall Street Assocs., L.L.C. v. Mattel, Inc.,
    552 U.S. 576 (2008) .............................................................................................................. 12

Halliburton Energy Servs., Inc. v. NL Indus.,
    553 F.Supp.2d 733 (S.D. Tex. 2008) .................................................................................. 22

Hill v. Heritage Res., Inc.,
    964 S.W.2d 89 (Tex. App.-El Paso 1997, pet. denied) ...................................................... 21

2032869v10
10459.002

*Holcim (Tex.) LP v. Humboldt Wedag, Inc.,*
  211 S.W.3d 796 (Tex. App.-Waco 2006, pet. granted) ...................................................... 20

*Howsam v. Dean Witter Reynolds, Inc.,*
  537 U.S. 79 (2002) ......................................................................................................... 21

*Humitech Dev. Corp. v. Perlman,*
  424 S.W.3d 782 (Tex. App.-Dallas 2014, no pet.) ........................................... 12, 13, 17, 22

*In re BP Oil Supply Co.,*
  317 S.W.3d 915 ............................................................................................................... 22

*In re Poly-America, L.P.,*
  262 S.W.3d 337 (Tex. 2008) ............................................................................................ 18

*Indian Beach Property Owners' Ass'n v. Linden,*
  222 S.W.3d 682 (Tex. App.-Houston [1st Dist.], pet. denied) ........................................... 21

*K.M.S. Research Labs., Inc. v. Willingham,*
  629 S.W.2d 173 (Tex. App.-Dallas 1982, no writ) ............................................................ 21

*Kansas City Luggage and Novelty Workers Union, Local No. 66 v. Neevel Luggage Mfg.
  Co.,*
  325 F.2d 992 (8th Cir. 1964) ............................................................................................ 36

*Kaplan v. First Options of Chi., Inc.,*
  19 F.3d 1503 (3rd Cir. 1994) ............................................................................................ 20

*LeBlanc v. Lange,*
  365 S.W.3d 70 ................................................................................................................. 18

*Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.,*
  256 F. Supp. 2d 594 (S.D. Tex. 2002) ............................................................................... 26

*Merrell Dow Pharm., Inc. v. Havner,*
  953 S.W.2d 706 (Tex.1997) .............................................................................................. 31

*Millmaker v. Bruso,*
  CIVA H-07-3837, 2008 WL 4560624  (S.D. Tex. Oct. 9, 2008) .......................................... 38

*Nafta Traders, Inc. v. Quinn,*
  339 S.W.3d 84 (Tex. 2011) ............................................................................................... 12

*OMG, LP v. Heritage Auctions, Inc.,*
  No. 3:13-CV-1404-L, --- F.Supp. ----,
  2014 WL 1315872 (N.D. Tex. Mar. 31 2014) ................................................... 14, 15, 18, 19

*Peabody Holding Co., LLC v. United Mine Workers of Am. Int'l Union,*
  665 F.3d 96 (4th Cir. 2010) .............................................................................................. 18

*Positive Software Solutions, Inc. v. New Century Mortg. Corp.,*
  476 F.3d 278 (5th Cir. 2007) ....................................................................................... 23, 24

*Retail Store Employees Union Local 782 v. Sav-on-Groceries,*
  508 F.2d 500 (10th Cir. 1975) .......................................................................................... 36

*Sphere Drake Ins. Ltd. v. All Am. Ins. Co.,*
   256 F.3d 587 (7th Cir. 2001).................................................................. 15, 18

*Steere Tank Lines, Inc. v. United States,*
   577 F.2d 279 (5th Cir. 1978)...................................................................... 7

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.,*
   559 U.S. 662 (2010)................................................................................ 22

*Stroehmann Bakeries, Inc. v. Local 776, Intern. Broth. of Teamsters,*
   969 F.2d 1436

*(3d Cir. 1992)*.................................................................... 27, 30, 33, 37

*Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC,*
   12-0789, --- S.W.3d ----, 2014 WL 2139215 (Tex. May 23, 2014) ............... 23, 36

*Tex. Liquor Control Bd. v. Canyon Creek Land Corp.,*
   456 S.W.2d 891 (Tex. 1970)................................................................... 22

*Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.,*
   607 F.2d 649 (5th Cir. 1979)................................................................. 36

*Trantham v. Isaacks,*
   218 S.W.3d 750 (Tex. App.-Fort Worth 2007, pet. denied) ................................. 21

*Wade v. Austin,*
   524 S.W.2d 79 (Tex. App.-Texarkana 1975, no writ) ......................................... 18

*Wilson v. Shanti,*
   333 S.W.3d 909 (Tex. App.-Houston [1st Dist.] 2011, pet. denied) ................... 31

### Statutes

28 U.S.C. § 1332(a) ............................................................................... 13
28 U.S.C. § 1391(a) ............................................................................... 13
9 U.S.C. § 10 ........................................................................................ 12
9 U.S.C. § 11 ........................................................................................ 13
9 U.S.C. §§ 1 - 13 .............................................................................. 12
9 U.S.C. § 10(a)(4)........................................................................... 36, 39
Internal Revenue Code § 831.......................................................... 6, 7, 10
Tex. Civ. Prac. & Rem. Code § 171.088(a)........................................... 12
Tex. Civ. Prac. & Rem. Code § 171.091(a)........................................... 13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CAPSTONE ASSOCIATED | § | |
| SERVICES, LTD., et al., | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO.: 4:14-cv-00768 |
| vs. | § | |
| | § | |
| GARY McNELLEY, et al., | § | |
| Defendants | § | |

**DEFENDANTS MARKET HEALTH, INC., GARY MCNELLEY, DAVID RIVERO, MH EXPORT CORP., NUTRITION CASUALTY CORP., AND SOLUTION CASUALTY CORP.'S BRIEF IN SUPPORT OF MOTION TO VACATE ARBITRATION AWARD OR ALTERNATIVE MOTION TO MODIFY ARBITRATION AWARD**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendants Market Health, Inc. ("Market Health"), Gary McNelley, David Rivero, MH Export Corp. ("MH Export"), Nutrition Casualty Corp. ("Nutrition"), and Solution Casualty Corp. ("Solution") (collectively, the "Market Health Entities") ask that the Arbitration Award ("Award")[1] before the Court be vacated or, alternatively, modified for three reasons:

(1) The Arbitrator lacked authority to enter an arbitration award. The Feldman Entities[2] initiated the arbitration proceeding based on an arbitration clause contained in billing guidelines attached to a retention agreement between the Feldman Law Firm and some of the Market Health

---

[1] The Award is attached as Ex. 1.

[2] The "Feldman Entities" refers to the Plaintiffs in this matter, specifically: Stewart Feldman ("Feldman"); The Feldman Law Firm (the "Firm"), which Stewart Feldman owns in its entirety; Capstone Associated Services, Ltd. and Capstone Insurance Management (Anguilla), Ltd. (a/k/a Capstone Insurance Management, Ltd.) (collectively "Capstone"), which are owned by Feldman, his wife, his children, or trusts inuring to their benefit; Export Assurance Company ("Export Assurance"), a division of Capstone Associated Services (Nevada), L.P. (now known as Capstone Associated Services (Wyoming), L.P.); and PoolRe Insurance Company, which is administered by Capstone and owned by Stewart Feldman's close friend, Steven Friedman. Export Assurance was not a party at the time of the final hearing, and Capstone Associated Services (Nevada), L.P. (now known as Capstone Associated Services (Wyoming), L.P) is not a Plaintiff in this matter.

2032869v10
10459.002

Entities. The Arbitrator found that no fees were ever paid to the Feldman Law Firm. Based on that finding, the disputes between the parties could not have arisen under the billing guidelines and the Arbitrator was without authority to proceed with arbitration and enter the Award on March 6, 2014.

(2)　The Arbitrator exceeded his authority by deciding the validity of the arbitration authority and the existence of contracts containing an arbitration provision. The Market Health Entities alleged that the agreements containing arbitration provisions were unconscionable and that they were fraudulently induced to enter into the agreements, which are issues of contract formation outside the authority of the arbitrator.

(3)　The Arbitrator exhibited evident partiality in favor of the Feldman Entities and engaged in misconduct before, during, and after the arbitration hearing (the "Hearing") in several ways:

(a)　The Arbitrator failed to disclose the very close business relationship between himself and Conflict Resolution Systems, PLLC ("CRS"), the arbitration organization with which he is related, and the Feldman Entities. After the arbitration proceeding, the Market Health Entities learned that there is a significant business relationship between the Feldman Entities and CRS/Arbitrator that were never disclosed. The Market Health Entities had previously sought discovery on the extent of that relationship, but the Feldman Entities refused to respond to that discovery. Based on the information Market Health has subsequently learned, CRS appears to be a virtual in-house arbitration mill for the Feldman Entities.[3]

---

[3] The relationship with CSR also includes RSL Funding, LLC ("RSL"), another company that is owned by Stewart Feldman. While not a party to this Arbitration, RSL's in-house counsel has represented PoolRe and Capstone in its various disputes with the Market Health Entities.

(b)   The Arbitrator made several statements during the arbitration proceeding indicating that he had prejudged the dispute, including telling the Market Health Entities *before the Hearing had even started* that he would not be "splitting the baby in this case." Additionally, *before the majority of evidence had been heard* the Arbitrator stated that "one of your clients is going to be disappointed because one of them is about to get their ass handed to them."  The Arbitrator's predetermination of a winner-takes-all outcome is contrary to the rule of an independent neutral.

(c)   The Arbitrator issued declarations that the Feldman Entities had no tort liability to the Market Health Entities, even though a determination of tort liability is outside of the permissible scope of declaratory relief – and then used those declarations as the basis to award attorney's fees to the Feldman Entities that they were not entitled to receive under the applicable substantive law.

(d)   The Arbitrator issued declaratory relief to the Feldman Entities on breach of contract claims in defiance of controlling substantive law that the determination of whether a party has breached a contract is not a proper subject for declaratory relief.

(e)   In order to award damages that were contrary to the undisputed evidence, the Arbitrator ignored uncontroverted admissions by representatives of the Feldman Entities that (1) Feldman breached his fiduciary duty to the Market Health Entities and (2) the Market Health Entities had properly given notice of their intent to terminate certain agreements.

(f)   The Arbitrator made several findings that have no support in the record and that, in some instances, are directly contrary to undisputed evidence.

(g)  The Arbitrator relied upon "expert" testimony of James McCormack even though Mr. McCormack was a fact witness (he was involved in drafting at least one of the agreements at issue in the arbitration) who was biased in favor of the Feldman Entities and whose opinions were not based on a reliable foundation.

(h)  The Arbitrator wholly ignored the expert testimony of Robert Schuwerk, whose testimony was offered on behalf of the Market Health Entities, by incorrectly finding that Professor Schuwerk had not testified on the applicable standard of care.

(i)  The Arbitrator awarded attorney's fees to the Feldman Entities on claims that they lost or did not even assert.

(j)  The Arbitrator included in the Award relief against persons and entities that were not parties to the arbitration proceeding.

(k)  The Arbitrator granted relief against entities without any factual basis for such an award.

As these actions by the Arbitrator show, the Award now before the Court was beyond the authority of the Arbitrator and was the result of a flawed, partial, and one-sided arbitration proceeding. For all of these reasons, the Award does not constitute a "mutual, final, and definite award" and therefore cannot be confirmed under the Federal Arbitration Act, the Texas Arbitration Act, and/or Texas common law.

## I.    NATURE & STAGE OF PROCEEDINGS

1.1    This proceeding arises out of a series of complex relationships between the Market Health Entities and several entities operated or controlled by Feldman. The Feldman Entities agreed to provide a variety of services relating to the formation and management of captive insurance companies as well as the participation of the captive insurance companies in

PoolRe, a reinsurance pool created and controlled by the Feldman Entities. Disputes between the parties arose in April of 2012, which ultimately led the Feldman Entities to retroactively deny access to PoolRe for 2012. The act of denying Market Health's captives access to PoolRe, and then refusing to provide alternative access to third party risk, precluded the Market Health Entities from receiving the tax benefits that were the basis for their relationship with the Feldman Entities.

1.2     The disputes between the parties have resulted in four arbitration proceedings, all involving the same arbitration facility, CRS, operated by former state court Judge Dion Ramos and the same arbitrator, Trey Bergman. The present suit involves the second arbitration, which resulted in the Award that was issued on March 6, 2014. The Feldman Entities have asked the Court to confirm the Award, while the Market Health Entities ask the Court to vacate or modify the award.

## II.     FACTUAL BACKGROUND

### A.  The Parties and Their Agreements

2.1     Feldman and the Firm solicited Market Health, McNelley, and Rivero in 2011 to participate in their captive insurance and IC-DISC programs, touting the potential for self-insurance and substantial tax savings. Market Health, McNelley, and Rivero became clients of the Firm in order to receive legal counsel regarding the possible creation and administration of these entities, which became Nutrition, Solution, and MH Export once formed. The relationship between the Feldman Entities and the Market Health Entities was memorialized through various memoranda and engagement letters that enumerated rights and duties of the parties.[4]

---

[4] At this point, the Market Health Entities reasonably placed their trust and confidence in the Feldman Entities—particularly McNelley, who suffers from Multiple Sclerosis and thus uniquely relies on his advisors to be diligent and forthcoming.

2032869v10
10459.002

2.2     The first such agreement was a Planning Memorandum issued on October 5, 2011 (the "Planning Memorandum"), which sets forth terms of an attorney-client relationship between the Firm and the Market Health Entities, called for a payment of $15,000, and creation of a study on the feasibility of forming captive insurance companies for the Market Health Entities under Internal Revenue Code § 831(b).[5] The Market Health Entities also entered into a separate agreement for creation of an IC-DISC, named MH Export, on November 1, 2011 (the "IC-DISC Agreement").[6] After a site-visit to Market Health's office, the Firm issued an Engagement Letter for Formation and Administration of a Captive Insurance Program (the "Engagement Letter") on November 7, 2011.[7] It referenced a number of "enclosures," including: (1) the Firm Billing Guidelines, which contained the arbitration provision upon which the Arbitrator relied for his authority;[8] (2) Duties and Responsibilities of Capstone and the Firm;[9] (3) the Capstone Services Agreement;[10] (4) Tax Risks and Responsibilities under § 831(b);[11] and (5) Brief Comparison of Types of Captives.[12] The Engagement Letter, with its enclosures (the "Captive Agreement"), is the primary document at issue in this dispute.[13]

### B. PoolRe & the Feldman Entities' Reinsurance Obligation

2.3     In the Captive Agreement, the Firm and Capstone agreed to provide unaffiliated third-party risk to Nutrition and Solution (collectively, the "Captives") so they would constitute

---

[5] *See* the Planning Memorandum attached as Ex. 2.

[6] *See* the IC-DISC Agreement attached as Ex. 3.

[7] *See* the Engagement Letter attached as Ex. 4.

[8] *See* the Billing Guidelines attached as Ex. 4-A, at 2-3.

[9] The Duties and Responsibilities of Capstone and the Firm is attached as Ex. 4-B

[10] The Services Agreement is attached as Ex. 4-C.

[11] The Tax Risks and Responsibilities under § 831(b) attached as 4-D.

[12]. The Brief Comparison of Types of Captives attached as Ex. 4-E.

[13] The Captive Agreement is comprised of Ex. 4, 4-A, 4-B, 4-C, and 4-E.

2032869v10
10459.002

captive insurance companies under § 831(b), allowing each Captive to qualify for an annual tax deduction of up to $1.2 million in insurance premiums.[14] Without an adequate level of unaffiliated third-party risk, the Captives would not constitute a bona fide insurer under § 831, and would lose the tax deduction that is one of the primary benefits the Feldman Entities promised to provide would be lost.[15] The Firm and Capstone's express promise to provide unaffiliated third-party risk was unlimited in scope.[16]

    2.4    During the creation of Nutrition and Solution, the Firm and Capstone informed Market Health that their Captives needed to participate in the PoolRe reinsurance pool in order to obtain this third-party risk.[17] PoolRe supposedly consists of only captive insurance companies that are also Firm clients and share similar risks. Each captive participant is assigned a "quota share" in PoolRe, which determines the premium amount it pays into PoolRe each year and the percentage of loss it bears if a captive incurs a claim on the pool.[18] Quota shares are reassessed each year based on the number of participants and their contributions, so PoolRe issues a Quota Share Policy for each year, with each policy covering only losses that occur within that calendar year.[19] However, the participation in PoolRe provisional until the end of the year, and is not finalized until the following year after the risk pool closes and quota shares have been calculated.[20]

---

[14] *See* Ex. 4-B at 2; Ex. 4-C at 3; *see also* 26 U.S.C. § 831(b) (providing a tax benefit for certain insurance companies that have net written premiums that do not exceed $1.2 million).

[15] *See* 26 U.S.C. § 831; *see also Steere Tank Lines, Inc. v. United States*, 577 F.2d 279, 280 (5th Cir. 1978) (recognizing that risk distribution amongst unrelated subscribers is a requisite of insurance); *see also* Ex. 5, Day 2 at 386:20–387:6; 400:1–400:5; 404:12–404:18 (Testimony of the Feldman Entities' expert Neil Doherty).

[16] *See* Ex. 4-B at 2; Ex. 4-C at 3.

[17] Ex. 5, Day 2 at 385:10 – 25; 395:23 – 12 (Testimony of Neil Doherty).

[18] Ex. 5, Day 2 at 331:14 – 333:12 (Testimony of PoolRe's corporate representative Robert Snyder).

[19] Ex. 5, Day 2 at 334:11 – 336:6 (Robert Snyder).

[20] See Ex. 5, Day 2 at 336:7 – 338:9 (Robert Snyder)

2032869v10
10459.002

2.5    The Feldman Entities failed to make several essential disclosures about the nature of PoolRe, including the following:

(1)  The Feldman Entities failed to disclose that the Firm's malpractice insurer, a captive insurance company controlled by Stewart Feldman, participates in PoolRe. The effect is that, any time a client makes a malpractice claim, the Firm's other clients must indemnify the Firm up to the amount of the client's "quota share"—*even the very client claiming malpractice*.[21]

(2)  The Feldman Entities also failed to disclose that Capstone and the Firm issue claim denials and reservation of rights letters to PoolRe members, so that Capstone and the Firm actually deny claims made by their own clients.[22]

(3)  There was also no disclosure that PoolRe, which maintains between $30 and $40 million annually, is owned by Feldman's personal friend, who can personally profit from the pool's investments.[23]

(4)  The Feldman Entities also did not disclose that, even though Market Health Entities paid over $1 million dollars in pool premiums throughout the course of a year, their participation in PoolRe was only "provisional" and that they could be denied access to PoolRe's critical risk-sharing even after fulfilling *all* premium payment obligations, because the Quota Share Policy for a calendar year is not issued until that calendar year ends.[24]

---

[21] *See* Ex. 5, Day 2 at 355:5 – 357:16 (Robert Snyder, board member and designated corporate representative for PoolRe, judicially admitted these disclosures should have been made to the Market Health Entities.).

[22] Ex. 5, Day 2 at 449:16 - 454:18 (Robert Snyder).

[23] Ex. 5, Day 2 at 317:1 – 16 (Robert Snyder's testimony that PoolRe is owned by Feldman's personal friend, Steven Freedman).

[24] Ex. 5, Day 2 at 336:7 – 338:9 (Robert Snyder).

(5)  Notwithstanding the Firm and Capstone's unqualified promise to provide third-party risk to the Captives, the Feldman Entities failed to disclose that PoolRe is the only option they will ever provide their clients.[25]

(6)  Finally, the Feldman Entities failed to disclose that, if a client does not (or is not allowed to) participate in PoolRe, Capstone will not fulfill its contractual obligation to provide third-party risk distribution.[26]

### C.  The Contractual Disputes

2.6     After becoming the Market Health Entities' attorney, Feldman engaged in improper fee negotiations with them in which he advocated on behalf of the Firm and Capstone concerning formation of the Captive Agreement.[27] In November of 2011, Feldman orally agreed to provide formation and administration of the Captives for $45,000 per captive, per year, which was confirmed in e-mail correspondence.[28] Per the Captive Agreement, the original contract term ran through December of 2013 and would automatically renew until December of 2016, unless the Market Health Entities gave notice of their intent to terminate the agreement.[29]

2.7     In April 2012, the Market Health Entities realized they were being charged more than $45,000 per year. Acting as the advocate of Capstone, and adversely to his own clients, Feldman responded that he agreed to that price only for the rest of 2011 (a mere seven weeks at the time of negotiations), and that the 2012 price was $64,000 per captive, per year. Realizing that amount had been slipped into the Captive Agreement contrary to their oral agreement, and

---

[25] Ex. 5, Day 1 at 108:25 – 110:2 (Capstone's corporate representative, Charles Earls).

[26] *See generally,* Ex. 4 and 4-A – 4-E.

[27] Ex. 5, Day 3 at 621:14 – 622:18 (Feldman admits an attorney may not negotiate fees between clients and that he has had run-ins with the State Bar of Texas for such conduct previously).

[28] November 8, 2011 Emails attached as Ex. 6.

[29] Ex. 4-C at 7, ¶4.6.

having been betrayed by their own attorney, the Market Health Entities gave notice of their intent

not to renew the contract at the end of its term, relieving all payment obligations once 2013

expired.[30] Capstone judicially admitted at the Hearing that the Market Health Entities gave

proper notice of intent to terminate the Captive Agreement at this time.[31] Feldman also

acknowledged that he should have given written notice to the Market Health Entities of a conflict

of interest.[32]

       2.8      After giving notice, the Market Health Entities continued to make payments as

required under the Captive Agreement to prevent breach. On December 19, 2012, McNelley

inquired with Feldman about the *possibility* of winding down the Captives by the end of the

year.[33] In response, Feldman once again took an adverse position to his client and instead

demanded assurances that his services would not be terminated, threatened to deny the Captives

entry into PoolRe, and warned that the Captives would lose their favored tax status and

potentially violate Delaware law if they wound down in such a short time frame.[34] In light of

Feldman's comments, the Market Health Entities *did not wind down the Captives*, and still have

not to this day.[35] Even though these discussions between Feldman and the Market Health Entities

were privileged attorney-client communications, Feldman disclosed the Market Health Entities'

inquiry on the possibility of winding down the Captives to PoolRe—without his clients' consent

to do so. This disclosure prompted PoolRe to revoke the Market Health Entities' provisional

---

[30] Ex. 5, Day 1 at 211:20 – 212:11 (Testimony of Capstone's corporate representative and Chief Operating Officer, Chuck Earls).

[31] Ex. 5, Day 1 at 212:7 – 10 ("**Q**. Wasn't that a notice or intent to terminate the agreement? **A.** (Charles Earls) Well, it was a notice of intent to terminate the agreement, yes. It was – it was –")

[32] Ex. 5, Day 3 at 801:22 – 4 (Stewart Feldman)

[33] December 2012/January 2013 Emails attached as Ex. 7, at 6.

[34] *Id.* at 5-6.

[35] Ex. 5, Day 2 at 338:10 – 22. (Robert Snyder)

2032869v10
10459.002

participation in the 2012 pool on the basis that they were no longer firm clients on December 21, 2014.[36] However, at the time that adversarial action was taken by Feldman and PoolRe, Feldman and the Firm's representation of the Market Health Entities had not ended.[37]

2.9    After retroactively being denied access to PoolRe, the Captives were left without the third-party risk required to legally take § 831(b) tax elections, defeating a primary benefit of the captive insurance program promised by the Feldman Entities, thereby exposing the Market Health Entities to potential tax liability. Feldman and the Firm then withdrew representation of the Market Health Entities at some point between December 24, 2012 and December 30, 2012, effectively declining half the services to be provided them under the Captive Agreement.[38] The Firm's failure to provide required legal services coupled with Capstone's inability to provide third-party risk resulted in breach of the Captive Agreement.[39] It was only after the Feldman Entities breached the Captive Agreement that the Market Health Entities ceased payments under its terms. Capstone subsequently filed its arbitration demand with CRS, commencing the first arbitration ("Capstone I").

2.10 Capstone I was filed with CRS and assigned to Bergman.  Concurrently, Capstone filed a declaratory judgment action in the United States District Court for the Southern District of Texas.  Defendants filed a responsive motion to dismiss, along with a motion to disqualify Feldman as counsel, which stayed the arbitration.  Capstone's federal action was subsequently

---

[36] Ex. 5, Day 2 at 335:20 – 336:12 (Robert Snyder); Day 1, 125:19 – 142:15 (Charles Earls); *see also* General Change Endorsement attached as Ex. 8.  Capstone, as administrator of PoolRe, unilaterally issued a general change endorsement revoking the Captives' participation retroactively to January 1, 2012, even though changes required the Market Health Entities' countersignature.

[37] Ex. 5, Day 3 at 782:14 – 785:14, 797:10 – 13 (Stewart Feldman).

[38] Although PoolRe justified denying the Captives' access to PoolRe by claiming the Market Health Entities were no longer Firm clients as required by contract, this explanation is baseless. The Market Health Entities were still Firm clients when PoolRe denied the Captives' access on December 21, 2012, as the Firm did not withdraw until at least December 24, 2012.  *See* Ex. 5, Day 3 at 797:10 – 13 (Stewart Feldman).

[39] Ex. 5, Day 4 at 1005:23 – 1012:23 (Market Health Entities' legal expert Prof. Robert Schuwerk).

dismissed by Judge Hittner. After the stay was lifted, the Arbitrator granted a motion to disqualify Feldman. The Firm, Capstone, and PoolRe then filed the second arbitration ("Capstone II"), which resulted in the March 6, 2014 Award the Health Market Entities now seeks to vacate or, alternatively, modify.[40]

### III.     STATEMENT OF ISSUES AND STANDARD OF REVIEW

3.1     The Award should be vacated or, alternatively, modified because the Arbitrator (1) lacked authority to arbitrate, (2) exhibited evident partiality in favor of the Feldman Entities, and (3) exceeded his authority, resulting in an Award that is not "mutual, final, and definite" and should be vacated, or alternatively, modified.

3.2     The Market Health Entities file this Brief pursuant to the FAA, 9 U.S.C. §§ 1 – 13; the TGAA, codified at Texas Civil Practice & Remedies Code Chapter 171; and Texas common law, which collectively prohibit the violations of authority, manifest errors, bias, evident partiality, and misconduct that tainted the arbitral process and that pervades the Award. Both Federal and Texas law apply because the FAA does not preempt state statute or common law unless the arbitration agreement specifically states the FAA applies. *See Hall Street Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 590 (2008); *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 v. 468, 477–78 (1989); *Nafta Traders, Inc. v. Quinn,* 339 S.W.3d 84, 87, 97 & n.64 (Tex. 2011); *Humitech Dev. Corp. v. Perlman*, 424 S.W.3d 782, 791 (Tex. App.— Dallas 2014, no pet.).

---

[40] A third arbitration (Capstone III), again filed with CRS and assigned to Bergman, contained the same allegations as Capstone II, but attempted to impose liability on entities that were not named in the Capstone II. Capstone III was dismissed by the Arbitrator for lack of an applicable Arbitration agreement on March 19, 2014. After this dismissal, Plaintiff's filed another demand ("Capstone IV"), once again including the Capstone III respondents, which CRS again assigned to Bergman. Despite having just dismissed Capstone III, the Arbitrator endeavored to begin the arbitral process until this Court stayed Capstone IV pending its determination of arbitrability.

2032869v10
10459.002

3.3     Under the FAA, a court may vacate an arbitration award in its entirety if: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrator; (3) the arbitrator was guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced; or of any other misbehavior by which the rights of any party were prejudiced; or (4) the arbitrator exceeded his powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10; *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380-81 (5th Cir. 2004).

3.4     Under the TGAA, a court may vacate an arbitration award in its entirety if: (1) the award was obtained by corruption, fraud, or undue means; (2) there was evident partiality, corruption, misconduct or willful misbehavior by the arbitrator; (3) the arbitrator exceeded his powers; or (4) there was no agreement to arbitrate. TEX. CIV. PRAC. & REM. CODE § 171.088(a). Additionally, Texas common law allows vacation of an arbitration award for gross error, manifest disregard of the law, or violation of public policy. *Humitech*, 424 S.W.3d at 791.

3.5     Alternatively, a district court may modify an arbitration award under the FAA so as to effect the intent of the award or to promote justice between the parties where: (a) there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award; (b) the arbitrator awarded upon a matter not submitted, unless it was a matter not affecting the merits of the decision upon the matter submitted; or (c) the award is imperfect in matter of form not affecting the merits of the controversy. 9 U.S.C. § 11. The grounds for modification of an arbitration award under Texas law mirror those under the FAA. TEX. CIV. PRAC. & REM. CODE § 171.091(a).

## IV. JURISDICTION & VENUE

4.1     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is proper pursuant to 28 U.S.C. § 1391(a), because this is the judicial district in which the Hearing occurred.

## V. SUMMARY OF THE ARGUMENT

5.1     The Award is riddled with abuses – abuses of authority, abuses of judgment, and abuses of the Hearing record itself. First, the Arbitrator lacked any authority to hear the parties' disputes. The Arbitrator exceeded his authority by: (1) making a factual finding that divested him of authority, and then, in the same document, awarding relief he had no authority to grant; (2) deciding issues strictly reserved under federal and Texas law for the courts; (3) creating his own law on declaratory judgments; (4) binding entities to the Award that were not parties to the proceeding; (5) awarding attorney's fees to the Feldman Entities on claims they actually lost or did not even bring; and (6) obligating parties to pay damages with no basis of liability. These jurisdictional and authoritative issues alone demand vacatur of the award under federal and state law.

5.2     Second, and even more disturbingly, an examination of the Hearing record in comparison to the Award and in light of the Arbitrator's pre-Hearing inflammatory statements reveals a consistent pattern which demonstrate his evident partiality. The circumstances include the Arbitrator's (1) failing to disclose the longtime symbiotic relationship between the Feldman Entities and his arbitral outfit; (2) making biased statements to the Market Health Entities before they presented a shred of evidence which demonstrated his determination from the outset to rule in favor of the Feldman Entities; (3) ignoring undisputed evidence—including the Feldman

Entities' judicial admissions establishing the Market Health Entities' defenses and causes of action—in order to manufacture his own version of the facts; and (4) quoting testimony in his Award that *never occurred*.

## VI.     ARGUMENT & AUTHORITY

### A.  The Arbitrator Entered the Award without Requisite Authority.

6.1     Arbitrators derive their power from the parties' agreement to submit to arbitration and have no jurisdiction apart from the parties' consent. *See Americo Life, Inc. v. Myer*, No. 12-0739, --- S.W.3d ----, Slip Op. at 4 (Tex. June 20, 2014).  An arbitrator can deprive himself of jurisdiction by finding that the agreement serving as the source of his authority is inapplicable, which is precisely what the Arbitrator did in this instance. *See OMG, LP v. Heritage Auctions, Inc.*, No. 3:13-CV-1404-L, --- F.Supp. ----, 2014 WL 1315872, at *5–6 (N.D. Tex. Mar. 31 2014).  In *OMG*, the arbitrator found the underlying agreements did not exist, necessarily invalidating the arbitration provision that purported to grant him authority to hear the dispute in the first place. *Id.* The court explained, "even the broad language in the arbitration clause providing that the parties agreed to arbitrate '[a]ny dispute or difference . . . arising out of or in any way relating to . . . the transactions contemplated in the [agreements]' is also not dispositive." *Id.* at *5.  "Although the [agreements] each contain a broad arbitration clause, the question about the agreements' formation was beyond the clause's scope, since no dispute could 'arise from' or 'relate to' an agreement that never existed." *Id.* at *5 (citations omitted).  "Here, the arbitrator's findings that the [agreements] never came into existence because there was no meeting of the minds between Heritage and OMG, and that there were never any obligations to perform, necessarily implied that the arbitration clauses contained in those agreements never existed either and were not binding obligations . . . . [O]nly a court could break this illogical

circularity." *Id.* (citations omitted); *see also Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001). Similar illogical circularity infects the Arbitrator's Award here and renders the entire Award unenforceable.

6.2     The Feldman Entities purported to invoke the authority of the Arbitrator via the Firm Billing Guidelines' arbitration provision. This document, "Client Information: Guidelines on Firm Administration and Billing," laid out terms and procedures for the Firm's billing of legal fees to the Market Health Entities, and their payment of legal fees to the Firm. In his Award, however, the Arbitrator held that no exchange of payment for legal services ever took place between the Firm and the Market Health Entities and no attorney-client relationship existed between Feldman and the Firm and the Health Market Entities.  Instead, the Arbitrator found that the Market Health Entities were obliged to pay Capstone[41]—an entity which was not even mentioned in the Guidelines.[42]  In making these rulings, the Arbitrator implicitly found the Guidelines were superfluous and entirely inapplicable to this dispute. As the Guidelines' arbitration provision could therefore no longer serve as the basis for arbitration, the Arbitrator thereby divested himself of jurisdiction by invalidating the very document that purported to grant him authority. In a confounding move of illogical circularity, the Arbitrator therefore exceeded his authority and exhibited a manifest disregard for the law by eviscerating his own jurisdiction and then subsequently proceeding to rule on the parties' causes of action.

---

[41] Specifically, the Arbitrator found, "Capstone, if requested by Respondents, must perform as set forth under the Engagement Letter and the Firm is directed to perform through tendering services to Capstone *and not directly to Respondents such that there is no attorney-client relationship.*"

[42] The Guidelines are clearly intended to govern billings for legal services because, among other representations, they state (1) "As with any type of legal representation . . . ," (2) "Our Firm provides open communications regarding the status of you legal affairs," and (3) "You have agreed that attorney Stewart Feldman, or another attorney in the Firm, has primary responsibility for the supervision of your legal affairs."

2032869v10
10459.002

6.3     Although the Feldman Entities will undoubtedly argue the Hearing was conducted under several arbitration provisions other than the provision in the Guidelines, this argument is meritless and factually inaccurate. Capstone initiated this proceeding under the Guidelines (which do not apply to Capstone). The Firm and PoolRe then used Capstone's improper arbitration demand to gain a forum for their own improper declaratory request against the Market Health Entities.   The Hearing was conducted pursuant to *only* the Guidelines' arbitration provision, and *not any other provision*—it was presided over by a single arbitrator, conducted under AAA rules, and subject to the four-month arbitration window, all per the Guidelines arbitration provision. On the contrary, *no* terms of any other arbitration provision cited by the Feldman Entities in their motion to confirm were followed and, in fact, they were completely disregarded (including that there be three arbitrators, that ICC arbitration rules govern, or that the proceedings take place in Anguilla, British West Indies). Further, the arbitration provision contained in PoolRe's 2011 Quota Share policy concerned only the 2011 calendar year, making it completely inapplicable to a dispute that arose and events that did not occur until the 2012 calendar year.

6.4     The entire basis for Capstone II and the Hearing was the Firm Billing Guidelines arbitration provision. After finding that no attorney-client relationship existed between Feldman and the Firm and the Health Market Entities, rendering the Guidelines inapplicable as to these parties and therefore invalid as a basis for arbitral authority, the Arbitrator should have properly declined to rule on any of the parties' causes of action for lack of jurisdiction.[43] *See Citicorp*

---

[43] In the event the Feldman Entities attempt to argue that the Firm Billing Guidelines apply to both the Firm and Capstone, this argument is belied by the Firm's own document, which never mentions Capstone or its services. Further, the Firm has since amended its firm Billing Guidelines to specifically include Capstone, demonstrating that Capstone was not previously a party to these guidelines. See Ex. 4-A, Guidelines at time of dispute; *compare* Guidelines as of September 2013 attached as Ex. 9. http://www.feldlaw.com/billing_admin.html.

2032869v10
10459.002

*Admin. Services, Inc. v. Mail Sort, Inc.*, 4:04-CV-223-A, 2004 WL 962832, at *3 (N.D. Tex. May 4, 2004) ("The service agreement is specifically limited by the description of work in schedule A. That work bears no relationship to the work performed by defendant the subject of this action. Accordingly, there is no basis for enforcement of an inapplicable arbitration clause."); *see also Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 297 (2010) ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute. To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or *applicability* of the specific arbitration clause that a party seeks to have the court enforce." (emphasis added). The Arbitrator's failure to do so mandates vacatur of the entire Award. *See Humitech Dev. Corp. v. Perlman*, 424 S.W.3d 782, 792 (Tex. App.—Dallas 2014, no pet.) ("Arbitrators exceed their powers when they decide matters not properly before them.").

## B. The Arbitrator Exceeded His Authority and Invaded the Judicial Province by Deciding the Validity of the Arbitration Provision and the Existence of Party Contracts.

6.5 Even where an arbitrator is given authority to determine the *arbitrability* of a dispute, whether a contract containing an arbitration agreement *exists* is a matter strictly reserved for the courts. *Granite Rock*, 561 U.S. at 296 ("[Where] the dispute at issue concerns contract formation, the dispute is generally for the courts to decide."); *OMG*, 2014 WL 1315872, at *4 ("'Absent a valid provision *specifically committing*' the issue of contract formation and applicability to an arbitrator, a court must resolve those issues."); *In re Poly-America, L.P.*, 262 S.W.3d 337, 346 (Tex. 2008) (holding even before the *validity* of an arbitration provision can be addressed, a court must first apply law on contract *formation*). When a party puts the existence of a contract in dispute, an arbitrator does not have the authority to decide issues of contract

formation, because the very document that purports to grant him authority may not exist. *See Sphere Drake*, 256 F.3d at 591 ("[A]s arbitration depends on a valid contract[,] an argument that the contract does not exist can't logically be resolved by the arbitrator."); *OMG*, 2014 WL 1315872, at \*5; *Peabody Holding Co., LLC v. United Mine Workers of Am. Int'l Union*, 665 F.3d 96, 105 (4th Cir. 2010); *see also Granite Rock*, 561 U.S at 2860-61.

6.6    The Market Health Entities alleged that party agreements were unconscionable and thereby put the very existence of such agreements in dispute. *LeBlanc v. Lange*, 365 S.W.3d 70, 88 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding unconscionability is an issue of contract formation); *Poly-America*, 262 S.W.3d at 348-49 (holding unconscionable agreements are unenforceable under Texas law); *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex. App.—Texarkana 1975, no writ) (holding contracts are rendered unconscionable by procedural abuse arising in the contract formation and by abuse concerning substantive contract terms). The Arbitrator had no authority to rule upon this issue or to proceed with arbitration assuming the existence of party agreements until a court of competent jurisdiction had resolved the Market Health Entities' challenge.[44] By proceeding with the Hearing despite a challenge to the very existence of the documents purporting to equip him with jurisdiction, the Arbitrator exceeded his authority and showed manifest disregard for the law. *See OMG*, 2014 WL 1315872, at \*6.

6.7    Further, while an arbitrator may determine the *validity* of an existing contract (distinguishable from the *existence* of a contract, which is a matter expressly reserved for the courts per *Granite Rock*), an arbitrator does not have the authority to determine the validity of an arbitration provision purporting to grant him authority; rather, validity of an arbitration provision

---

[44] Further, the Feldman Entities have rightfully acknowledged this Court's jurisdiction to determine whether a contract exists to govern the dispute currently pending in Capstone IV, which is consistent with the authority of a court over a dispute regarding the existence of a contract.

must be considered by the court in the first instance. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006). Through submissions to the Arbitrator on the unenforceability of the Firm Billing Guidelines arbitration provision, as well as by alleging unconscionability and fraudulent inducement, the Market Health Entities specifically put the validity of the arbitration provision at issue. *Id.* at 445 ("[I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it."). Specifically, the Market Health Entities argued that the Guidelines' arbitration provision was unconscionable based on the Firm and Feldman's lack of disclosures about its existence, content, and import, particularly in light of the fiduciary duties the Firm and Feldman owed to them. Indeed, the Market Health Entities could not agree to the arbitration provision in the absence of such material disclosures, and therefore there could not be a "meeting of the minds" over the arbitration provision. *See OMG*, 2014 WL 1315872, at *6 (determining no arbitration provision existed because no meeting of the minds). The Arbitrator nevertheless issued a ruling on the validity of the arbitration provision (and thereby improperly attempted to endow himself with authority that only a court could grant), as well as proceeded in light of his own ruling to a final Hearing. The Arbitrator's actions demonstrate an extreme overreaching of his authority and jurisdiction and manifest disregard for the law, mandating vacatur.

## C. The Market Health Entities did not waive their objections to the validity and applicability of the underlying arbitration provision.

6.8     The Market Health Entities raised their objections to the validity and applicability of the arbitration provision in detail in their "Brief on the Unenforceability of the Arbitration

Provision," filed on April 17, 2013, in Capstone I.[45] The Arbitrator evaluated the arbitration provision, held it was valid, and proceeded with the arbitration until it was stayed on May 16, 2013.[46] When the Arbitrator consolidated Capstone I and Capstone II on November 13, 2013, he "ORDERED that all rulings by the Arbitrator in the First Arbitration remain in full force and effect and will not be re-litigated in this Consolidated Arbitration." This ruling by the Arbitrator preserved the Market Health Entities' objections. A party is not required to enjoin or stay an arbitration proceeding in order to preserve its objection, and that objection, once stated, remains preserved for judicial review, even when the party thereafter participates in arbitration proceedings and files counterclaims. *See Kaplan v. First Options of Chi., Inc.*, 19 F.3d 1503, 1510, 1512 (3rd Cir. 1994); *ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Union*, 741 F.3d 627, 631 (5th Cir. 2014); *see Holcim (Tex.) LP v. Humboldt Wedag, Inc.*, 211 S.W.3d 796, 802-03 (Tex. App.—Waco 2006, pet. granted).

6.9    Although the Arbitrator stated in the Award that the parties had "waived any claims and objections they may have previously had regarding arbitrability," arbitrability refers only to the scope of claims an arbitrator may hear, not whether the arbitration provision itself is valid. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 79 (2002). At the Hearing, the Arbitrator only requested confirmation that he could hear claims alleged in the parties' live pleadings regardless of whether they fell within the scope of the arbitration agreement, as clarified by his inquiry on whether he could hear claims potentially heard by the Houston Bar

---

[45] *See* Brief on the Unenforceability of the Arbitration Provision attached as Ex. 10.

[46] *See* May 16, 2013 Order attached as Ex. 11.

2032869v10
10459.002

Association.[47]   The Arbitrator did not request that parties waive any objections to the *validity* of the underlying arbitration provision, and the Market Health Entities did not do so.[48]

### D. The Arbitrator Created His Own Law on Declaratory Judgments to Facilitate a Higher Fee Award to the Feldman Entities.

6.10    The Arbitrator granted multiple declaratory judgments on tort and breach of contract causes of action, defying Texas law and, in fact, charting new legal territory.[49]   First, a party may not employ a declaratory judgment proceeding to determine potential tort liability, as it is a tort claimant's right to choose the time and place to bring suit. *See Abor v. Black*, 695 S.W.2d 564, 566 (Tex. 1985); *Trantham v. Isaacks*, 218 S.W.3d 750, 753 (Tex. App.—Fort Worth 2007, pet. denied); *K.M.S. Research Labs., Inc. v. Willingham*, 629 S.W.2d 173, 174 (Tex. App.—Dallas 1982, no writ). Additionally, "The determination of whether a party has breached a contract, while affecting a party's rights or status, is not a declaration of a right or status and therefore, is not the proper subject of a declaratory judgment," yet the Arbitrator issued a declaration that the Market Health Entities breached contracts with Capstone and PoolRe and awarded fees in conjunction with this finding. *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 140 (Tex. App.—El Paso 1997, pet. denied); *Indian Beach Property Owners' Ass'n v. Linden*, 222 S.W.3d 682, 699 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

6.11    Despite the foregoing settled law, the Arbitrator issued declaratory judgments of no liability concerning Respondents' torts and breach of contract claims. Because the Market Health Entities and the Feldman Entities asserted tort and breach of contract claims in Capstone II, the Arbitrator's declaratory relief was gross error and manifest disregard of the law. *See*

---

[47] Ex. 5, Day 1 at 27:14 – 29:13 (Arbitrator)

[48] *Id.*

[49] *See* Ex. 1, Award at 22-23.

2032869v10
10459.002

*Humitech*, 424 S.W.3d at 791 (recognizing that Texas' common-law grounds for vacatur include gross error and manifest disregard of the law). "An action for declaratory judgment will not be entertained if there is pending, at the time it is filed, another action or proceeding between the same parties and in which may be adjudicated the issues involved in the declaratory action." *In re BP Oil Supply Co.*, 317 S.W.3d 915, 921 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (quoting *Tex. Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970)); *see also Etan Indus., Inc. v. Lehmann*, 359 S.W.3s 620, 624–25 (Tex. 2011) (holding trial court erred by granting declaratory relief because the declarations added nothing to the relief sought in other causes of action brought in the same action).

6.12    The Arbitrator's issuance of declaratory relief to the Feldman Entities on both tort and breach of contract causes of action goes even beyond exceeding authority or manifest disregard for the law; it demonstrates the extreme lengths to which the Arbitrator was willing to go in order to enable the Feldman Entities to recover attorney's fees—to the point of *creating* his own causes of action that do not exist under Texas law and dispensing "his own brand of industrial justice."[50]

### E. The Arbitrator's Demonstrated Evident Partiality for the Feldman Entities Warrants Vacatur.

6.13    The Arbitrator's conduct in the Hearing and the Award clearly demonstrates evident partiality shown to the Feldman Entities sufficient to justify vacatur. In addition to the excesses of authority and assertion of jurisdiction where none existed, the Arbitrator manipulated the uncontroverted factual record, ignored legally binding party admissions and unsavory facts, concocted his own "evidence" that does not exist in the record, relied on inadmissible expert

---

[50] *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 671 (2010); *Halliburton Energy Servs., Inc. v. NL Indus.*, 553 F.Supp.2d 733, 752 (S.D. Tex. 2008).

testimony and fashioned remedies not supported by law or the record, all of which showcase his patent preference for the Feldman Entities.[51] There was simply no way for the Market Health Entities to prevail on their causes of action under the Arbitrator's contrived version of the facts and misapplication of law.

### 1. Legal standard

6.14    Parties to arbitration are entitled to disclosure of all conflicts of interest that might impact an arbitrator's neutrality. *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 146-49 (1968). "[P]arties should have access to all information that might reasonably affect the potential arbitrator's impartiality. This could obviously include, for example, a familial or close social relationship." *Burlington N. R.R. Co. v. TUCO, Inc.*, 960 S.W.2d 629, 637 (Tex. 1997). Where a relationship between an arbitrator and a party is repeated and significant, or the party is one of the arbitrator's regular customers, vacatur is required in the absence of disclosure. *Id.*

6.15    Evident partiality requires vacating an award if an arbitrator fails to disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality. *See Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 12-0789, --- S.W.3d ----, 2014 WL 2139215, at *6 (Tex. May 23, 2014); *see also Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 283–84 (5th Cir. 2007) (recognizing arbitrator exhibits evident partiality when he does not disclose facts that create a reasonable impression of bias).

---

[51] The Market Health Entities paid for the Arbitrator to have the benefit of real-time transcripts of the arbitration, so these errors were *not* a result of the Arbitrator's inability to access the record at the time he crafted the Award. Moreover, the Arbitrator informed the parties that he made audio-recordings of the Hearing. The Market Health Entities made a request of the Arbitration's case clerk, Robin Berry, to preserve the recordings and offered to bear the expense of the preservation. However, they were informed that the recordings were destroyed. See Declaration of William R. Moye attached as Ex. 12 at ¶5. Letter from State Bar of Texas to Stewart Feldman (8-26-04) Letter from James McCormack to State Bar of Texas (9-21-05) *See* December 2012/January 2013 emails Ex. 5, Day 1 at 27:14 – 29:13 (Stewart Feldman).

"[E]vident partiality is established from the nondisclosure itself, regardless of whether the nondisclosed information necessarily establishes partiality or bias." *Tenaska Energy*, 2014 WL 2139215, at *5 (quoting *TUCO*, 960 S.W.2d at 636). An arbitration award may not be vacated because of a trivial or insubstantial prior relationship between the arbitrator and the parties to the proceeding. *Positive Software*, 476 F.3d at 283–84. If an objective observer could not believe the undisclosed information might create a reasonable impression of partiality, the information is trivial and the arbitrator did not exhibit partiality by failing to disclose it. *TUCO*, 960 S.W.2d at 636–37. However, an award should not be affirmed if reasonable persons might debate whether the circumstances indicate evident partiality: "[T]he fact that a reasonable person could conclude that the [circumstances] might affect [the arbitrator's] impartiality triggers the duty to disclose." *Id.* at 639.

### 2. The Arbitrator's failure to disclose CRS's significant business relationship with the Feldman Entities constitutes evident partiality.

6.16    The Arbitrator failed to disclose the significant business relationship between CRS, Judge Ramos, and the Feldman Entities. Additionally, the Feldman Entities refused to answer discovery regarding the relationship. While the full extent of the relationship between CRS and Feldman's businesses is still unknown, the Market Health Entities are now aware that Stewart Feldman and his companies have fed a significant amount of litigation to CRS, creating relationship that is not "trivial or insubstantial."[52] While there is little information in the public domain regarding CRS, a review of what is available illustrates a history of referrals to CRS for various Feldman owned entities and a consistent record of favorable decisions. For example,

---

[52] *See Positive Software*, 476 F.3d at 283.

2032869v10
10459.002

RSL Funding has filed numerous motions to confirm arbitration awards issued through CRS.[53]

Additionally, searching "Conflict Resolution Systems" on Westlaw returns only pleadings and opinions related to CRS arbitrations for Feldman Entities or other entities owned or controlled by Feldman.[54]

      6.17    In fact, despite the hurdles to obtaining vacatur, one award from CRS and Judge Ramos was very recently vacated for wrongful assertion of jurisdiction. In *PoolRe Insurance Corp. v. Organizational Strategies, Inc.,* the respondents moved to vacate Judge Ramos's award, which parroted Feldman's proposed award on the basis that there was no valid arbitration agreement at issue and that Ramos had exceeded his authority, shown evident partiality to the Feldman entities, and engaged in misconduct. No. H-13-1857, 2014 WL 1320188, at *8, *31 (S.D. Tex. Mar, 31, 2014) (slip copy) ("Later that day, Ramos issued the first arbitration's award, which was nearly identical to the proposed award provided by the Feldman entities."). The *PoolRe* court ultimately vacated the award based on Judge Ramos's lack of jurisdiction, making it unnecessary for the court to analyze the misconduct allegations. *Id.* at *20. Nonetheless,

---

[53] *See e.g.* Case No. 1:13-cv-01271-JFM, *RSL Funding, LLC v. Wheeler*, In the United States District Court for the District of Maryland (Doc. Nos. 1 and 1-2); Case No. 4:13-cv-02197, *RSL Funding, LLC v. Johnson,* In the United States District Court for the Southern District of Texas (Doc. Nos. 1 and 1-3); Case No. 4:13-cv-01958, *RSL Funding, LLC v. Hill,* In the United States District Court for the Southern District of Texas (Doc. Nos. 1 and 1-3); Case No. 4:13-cv-01950, *RSL Funding, LLC v. Na,* In the United States District Court for the Southern District of Texas (Doc. Nos. 10 and 10-4); Case No. 4:13-cv-00941, *RSL Funding, LLC v. Rodriguez,* In the United States District Court for the Southern District of Texas (Doc. Nos. 1 and 1-2); Case No. 4:13-cv-00907, *RSL Funding, LLC v. Henderson,* In the United States District Court for the Southern District of Texas (Doc. Nos. 1 and 1-8); Case No. 4:13-cv-00806, *RSL Funding, LLC v. Ubezonu,* In the United States District Court for the Southern District of Texas (Doc. Nos. 10 and 10-3); Case No. 1:13-cv-00642-RHB, *RSL Funding, LLC v. Baird,* In the United States District Court for the Western District of Michigan (Doc. Nos. 1 and 1-2); Case No. 3:13-cv-00570-MCR-CJK, *RSL Funding, LLC v. Mason,* In the United States District Court for the Northern District of Florida (Doc. Nos. 1 and 1-3); and Case No. 4:13-cv-02058, *RSL Funding, LLC v. Green,* In the United States District Court for the Southern District of Texas (Doc. Nos. 1 and 1-8);

[54] There is scant information about CRS in the public domain. Records maintained by the Texas Secretary of State and the Texas Comptroller of Public Accounts indicate that Dion Ramos is the sole member of CRS. A Westlaw Search results in documents relating to arbitrations involving (1) either Dion Ramos or Trey Bergman as the mediator appointed by CRS, and (2) A Feldman entity--Capstone, the Feldman Law Firm, PoolRe, or RSL Funding--as one of the parties to the dispute.

Ramos's all-or-nothing award follows the same pattern as the Award in this case, specifically (1) concluding the respondents materially breached contracts with the Feldman Entities; (2) ordering respondents to continue quarterly payments to Capstone; (3) providing declaratory relief that the Firm was not liable for tort claims for professional negligence and breach of fiduciary duty; (4) awarding substantial attorneys' fees to the Feldman entities; and (5) ignoring the respondents' defenses and claims to issue a winner-takes-all result. *Id.* at *9. The similarities between these awards are beyond coincidence.

### 3. The Arbitrator's biased pre-evidence statements constitute evident partiality.

6.18    The Arbitrator showed evident partiality by informing the Market Health Entities' counsel,[55] on *three separate occasions*, of his decision to issue an award that grossly favored one side. Most importantly for purposes of establishing evident partiality, all three statements were made *before the Market Health Entities ever began to present evidence at the Hearing*. First, at a discovery hearing, the Arbitrator advised he would not be "splitting the baby in this case."[56] Second, at the pretrial hearing, the Arbitrator informed counsel that, unlike in some arbitrations in which the arbitrator "splits the baby," in this instance, "there will be a winner and a loser." Finally, during the Feldman Entities' case-in-chief at the Hearing, and before the Market Health Entities had presented *any* evidence, the Arbitrator stated to counsel that, "one of your clients is going to be disappointed because one of them is about to get their ass handed to them."[57]

---

[55] Of course, at the time the Arbitrator made these statements, Defendants did not know the Arbitrator was intimating that he would be ruling in favor of the Feldman Entities. But, as explained below, this intention is clear in hindsight considering the Arbitrator's actions and findings as a whole.

[56] *See* Ex. 12, Declaration of William R. Moye at ¶2.

[57] *See* Ex. 12, Declaration of William R. Moye at ¶4. This particular comment was made by the Arbitrator to counsel for Respondents, William R. Moye, and counsel for Capstone and PoolRe, L. Andy Paredes, in the hallway of the Arbitrator's office prior to the Market Health Entities' case-in-chief. A prior comment by the Arbitrator that "there would be a winner and a loser" was made on February 14, 2014. *See* Ex. 12, Declaration of William R. Moye at ¶3.

2032869v10
10459.002

6.19    The timing of the Arbitrator's statements demonstrates his partiality. Unlike instances in which a court found an arbitrator's questionable statements harmless when made near the close of evidence because considerable testimony had been heard,[58] the Arbitrator's statements were made before the Hearing started, before he had heard from either side's legal malpractice expert, or before he had heard any of the Market Health Entities' case-in-chief. *See Ballantine Books*, 302 F.2d at 21 ("It is to be expected that after a judge or an arbitrator has heard considerable testimony, he will have some view of the case. *As long as that view is one which arises from the evidence and the conduct of the parties it cannot be fairly claimed that some expression of that view amounts to bias.*" (emphasis added)). In light of the abrasive and biased nature of Arbitrator's statements, they cannot reasonably be considered merely "legitimate efforts to move the proceedings along expeditiously." *Fairchild & Co., Inc. v. Richmond, F. & P. R. Co.*, 516 F. Supp. 1305, 1313 (D.D.C. 1981).

6.20    A reasonable person could conclude that the Arbitrator's statements prove that he decided all issues in favor of one side prior to hearing evidence in the case. A reasonable person could also conclude the Arbitrator's actions described in the following sections, coupled with his ultimate award and obviously-biased findings, proves that the predestined losers were the Market Health Entities. The Market Health Entities were entitled to have all their claims heard by a nonpartisan arbitrator open to considering fully both sides' claims and defenses. Ultimately, the

---

[58] *See, e.g., Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*, 256 F. Supp. 2d 594, 629 (S.D. Tex. 2002) (explaining arbitrators did not evince evident partiality through their behavior and statements, particularly because they had already received and reviewed "volumes of evidence" from both parties); *Ballantine Books, Inc. v. Capital Distrib. Co.*, 302 F.2d 17, 20–21 (2d Cir. 1962) (rejecting evidence partiality based on arbitrator's expression of his opinions because, by the time he made the expression, almost all of the evidence from both sides had been presented).

2032869v10
10459.002

Arbitrator's premature conclusion changed the arbitration from a disinterested evaluation of the parties' evidence on each claim into an all-or-nothing, winner-takes-all sham.[59]

### 4. The Arbitrator ignored uncontroverted admissions to generate a one-sided Award.

6.21    It is clear the Award was crafted to produce a winner-takes-all result in favor of the Feldman Entities, as it completely ignores clear, deliberate, uncontroverted party admissions that provided prima facie proof of the Market Health Entities' claims and defenses. These admissions, if properly considered in accordance with the rules of evidence, mandated rulings in the Market Health Entities' favor.

6.22    First, the Award completely ignores an admission by the President, Chief Operating Officer, and corporate representative of Capstone, Charles Earls, that the Market Health Entities gave proper notice of intent to terminate the agreements between Claimants and Respondents, cutting off any payment obligations past 2013.[60] When Feldman took the stand and attempted to contradict Capstone's admission, the Arbitrator advised that his testimony was so diametrically opposed to Earls' testimony that the witnesses were effectively impeaching each other.[61] Nevertheless, the Arbitrator found the Market Health Entities did not give notice, had breached the Captive Agreement, and owed fees through 2016.[62] Had the Arbitrator accepted the admission by Earls, fees could have only been awarded through 2013.[63]

---

[59] *See e.g. Stroehmann Bakeries, Inc. v. Local 776, Intern. Broth. of Teamsters,* 969 F.2d 1436, 1446 (3d Cir. 1992) (Arbitrator's statement that if he had to make a decision on the merits he would find in one employee's favor, despite making it clear that he had not fully considered evidence on the employer's charge of misconduct by the employee supported vacatur).

[60] Ex. 5, Day 1 at 211:20 – 212:11 (Charles Earls).

[61] Ex. 5, Day 3 at 664:5 – 668:23, 669:6 – 21 (Stewart Feldman).

[62] *See* Ex. 1, Award at 19.

[63] The result of this is that the Arbitrator imposed an additional $384,000 in damages against the Market Health Entities.

2032869v10
10459.002

6.23    Second, the Feldman Entities admitted that the Market Health Entities did not do anything that might constitute breach of any agreement until February 2013, after the Feldman Entities had already stopped performing their obligations.[64] The Arbitrator reached the contrary result, however, finding the Market Health Entities had breached in December 2012, excusing the Feldman Entities' later nonperformance.[65]

6.24    Third, Feldman admitted it was inappropriate for him to negotiate his attorney's fees with the Market Health Entities because it created a conflict of interest.[66]  However, upon realizing the damage his admission would cause, he subsequently testified that he emailed an employee of the Market Health Entities that he was ethically forbidden to have this type of conversation, thereby making seem as though he had complied with his fiduciary responsibilities.[67] This testimony could not be true, however, because this employee no longer worked for any of the Market Health Entities at the time of Feldman's alleged correspondence.[68]

6.25    These admissions by the Feldman Entities establish substantive proof of the Market Health Entities' claims.  Despite these admissions, the Arbitrator found that all of the claims by the Market Health Entities were brought merely as a "creative attempt to obfuscate the issues."[69]

### 5.   The Arbitrator based his Award on "evidence" that does not exist.

6.26    There are multiple instances in the Award in which the Arbitrator purportedly quotes Hearing testimony as the basis for his rulings, even though no such testimony ever

---

[64] Ex. 5, Day 1 at 167:7 – 169:4 (Charles Earles); Day 3 at 603:2 – 7 (Stewart Feldman); *see also* Plaintiffs' March 6, 2013 Arbitration Demand attached as Ex. 13.

[65] *See* Ex. 1, Award at 18.

[66] Ex. 5, Day 3 at 621:14 – 622:18 (Stewart Feldman).

[67] Ex. 5, Day 3 at 801:22 – 804:25 (Stewart Feldman).

[68] Ex. 5, Day 4 at 1112:1 – 6 (Gary McNelley)

[69] Ex. 1, Award at 18.

2032869v10
10459.002

occurred. Multiple findings of fact in the Award are also simply untrue and unsupported by the record. These inaccuracies go beyond mere errors to demonstrate the Arbitrator's ultimate aim to craft a factual record most beneficial to the Feldman Entities.

6.27    First, the Award purports to quote the Market Health Entities' captive insurance expert, stating that "the actions of Claimants complained of by Respondents 'could go either way' when it came to fault."[70] This language is *nowhere* in the record.[71]

6.28    Second, the Award contains a number of misstatements regarding McNelley's credentials as an expert in the field of captive insurance companies in order to obfuscate the need for Feldman to fulfill his fiduciary obligations to provide necessary legal advice.  For instance, the Award states that McNelley testified that he had an undergraduate degree in business administration, even though the Arbitrator actually elicited contradictory testimony.[72]  The Award also states that McNelley testified that he is the president of an insurance company doing business in 37 states.[73] McNelley *never* provided this testimony.

6.29    Third, the Arbitrator found that the Market Health Entities directed Capstone in 2012 to bind coverages for 2013.[74] Yet there is no testimony or evidence in the record to support this finding.

6.30    Fourth, the Award states that Capstone "continued to perform its obligations under the Engagement Letter."[75] However, this statement completely ignores that Capstone

---

[70] *See* Award, Ex. 1 at 18.

[71] The Award does not identify which of Defendants' captive insurance experts allegedly made the quoted statement. Regardless, the record is devoid of such testimony. *See generally* Ex. 5, Day 5 at 1152-1213 (Donald Bendure); 1216-1255 (Rodney Morris).  This allegation was, however, contained in the Feldman Entities' Joint Post-Hearing Submission, attached as Ex. 19 at p .5, and in their Proposed Final Arbitration Award, attached as Ex. 20 at 6.

[72] *See* Award, Ex. 1 at 6; *see also* Ex. 5, Day 5 at 1140:24 – 1141:25 (Gary McNelley).

[73] *See* Award, Ex. 1 at 6.

[74] *See* Award, Ex. 1 at 21.

2032869v10
10459.002

failed to provide any third party risk in 2013 and that the Captive Agreement contains no language limiting that obligation to PoolRe.[76]

### 6. The Arbitrator relied on inadmissible expert testimony.

6.31　　The Arbitrator demonstrated evident partiality and gross bias by overtly relying upon inadmissible testimony of Plaintiff's legal malpractice expert in order to support his predetermined all-or-nothing result in favor of the Feldman Entities. The testimony of James McCormack was inadmissible and is no evidence due to his role as a fact witness to the underlying dispute, the unreliability of his opinions, and his vested interest in the Hearing's outcome.

### a. McCormack was a grossly biased fact witness in the underlying dispute.

6.32　　As a fact witness to the parties' disputes, McCormack was not a proper expert witness. In fact, McCormack helped write the Captive Agreement. Additionally, he helped Feldman compose the e-mail from Feldman to the Market Health Entities on December 21, 2012, in which Feldman threatened to revoke the Captives' access to PoolRe and admitted to disclosing the Market Health Entities privileged information to PoolRe.[77] Given the fact that he authored (1) one of the key agreements at dispute in this case; and (2) an email that is at the center of the Market Health Entities' claims, it is no surprise that he blessed the Feldman Entities conduct in his capacity as a "legal malpractice expert" at the Hearing. Despite McCormack's entanglement with the underlying agreement and dispute, the Arbitrator denied the Market Health Entities' motion to exclude him as an expert witness.[78]

---

[75] *Id.*

[76] *See generally* Captive Agreement, Ex. 4; see also Ex. 5, Day 1 at 100:17 – 110:2 (Charles Earls).

[77] *See* December 2012/January 2013 E-mails, Ex. 7 at 5-6; *see also* Ex. 5, Day 4 at 925:7 – 22 (The Feldman Entities' legal expert, James McCormack).

[78] Ex. 5, Day 4 at 927:14 – 930:19 (James McCormack).

2032869v10
10459.002

### b. McCormack's opinions were based on an unreliable foundation.

6.33    McCormack's opinions were also inadmissible and no evidence because they were based on an unreliable foundation. If an expert bases his opinion upon unreliable foundational data or facts that vary materially from the version of facts established by his client, any opinion drawn from those facts and data is unreliable and constitutes no evidence. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997).

6.34    In this case, McCormack unequivocally testified that the foundation for all of his opinions was his belief that the Market Health Entities did not pay any legal fees to the Firm, but that all fees were instead paid to Capstone.[79]    However, the Feldman Entities' position throughout the proceeding was that the Market Health Entities *did* pay legal fees to the Firm, rendering McCormack's contradictory opinions unreliable, inadmissible, and no evidence.[80]    *See Wilson v. Shanti,* 333 S.W.3d 909, 914 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (expert testimony was unreliable and properly excluded where based on belief that plaintiff's pain started after third set of injections, but plaintiff testified it started after second set of injections).

### c. McCormack's opinions at the Hearing contradict representations he made to the State Bar of Texas on Feldman's behalf in 2005-06.

6.35    Finally, McCormack's testimony also contradicted information contained in his file, which uncovered his long relationship as Feldman's malpractice and ethics counsel.

---

[79] *See* Opinions of Robert P. Schuwerk (in plain text and italics) and James McCormack (in bold) attached as Ex. 14 at ¶1.a ("…Respondents were obligated under the agreement to pay fees to Capstone. Capstone would then pay to the law firm those legal fees. . . ."); *see also* Ex. 5, Day 4 at 927:14 – 928:11 ("**Q.** And this is a factual basis for your opinions in this case, correct? A. [McCormack] It is."); *see also* Ex. 5, Day 4 at 979:13 – 980:8 wherein Professor Schuwerk explains that Ex. 14, which was admitted as Respondents Ex. 88,  is a compilation of the written opinions of both he and Mr. McCormack.

[80] *See* Feldman Law Firm Interrogatory No. 1 Response attached as Ex. 15, at 6; *see also* Ex. 5, Day 3 at 758:19 – 759:4 (**Q.** Okay. And if it turns out that [McCormack] is saying that Market Health never paid The Feldman Law Firm legal fees, do you agree with that fact? **A.** [Feldman] Absolutely not.")

McCormack's file also revealed that this was not Feldman's first encounter with legal malpractice complaints concerning services and fees paid under the Firm/Capstone program.

6.36    In 2005 and 2006, Feldman was the subject of an investigation by the State Bar of Texas into grievances filed involving the multidisciplinary relationship between Capstone and the Firm. After Feldman accepted an eighteen-month suspension from law practice, the State Bar elected not to file suit against him.[81] However, McCormack's file, produced days before the Hearing, reveals that the State Bar elected not to file suit because Feldman and McCormack represented to the State Bar representing that under the captive agreements, clients paid fees to the Firm, the Firm maintained individual billing records for each client, and the Firm deducted its portion for legal fees before forwarding the remainder to Capstone.[82]    Specifically, they stated, "The Feldman Law Firm retains its hourly billing and expenses incurred in its representation of the client . . . the law firm records its attorney time by the hour along with all expenses and receives only the payment for those items."[83] This statement to the State Bar contradicts McCormack's testimony in this matter that all fees are paid to Capstone.

6.37    To further confuse their position on client billing, in response to the Market Health Entities' interrogatory requesting the amount of time, timekeepers, and overall fees incurred by the Firm for legal work performed for under the Captive Agreement, the Firm responded: "No attempt is made to identify the work done for the respondents as opposed to other joint clients or prospective clients or for Capstone generally. Such records are not

---

[81] *See* Agreed Judgment at3 attached as  Ex. 16.

[82] *See* August 26, 2004 Letter from State Bar of Texas to Stewart Feldman, attached as Ex. 17.

[83] *See* September 21, 2005 Letter from James McCormack to State Bar of Texas, attached as Ex. 18.

2032869v10
10459.002

separately maintained[.]"[84] This again contradicts the representation to the State bar that the Firm "retains its hourly billing and expenses incurred in its representation of the client."[85]

6.38    McCormack's testimony at the Hearing belied his own file, diverged from his prior statements to the State Bar of Texas, and contradicted the Feldman Entities' admission that legal fees *were* actually paid to the Firm. Despite the manifest reasons for his disqualification, not only did the Arbitrator allow McCormack's continued testimony over The Health Market Entities' objections, he completely adopted McCormack's opinions offered at the Hearing— including his newly fabricated, contradictory proposition that all fees were paid to Capstone and that *no* fees were ever paid to the Firm.[86] To accept McCormack's epiphany, the Arbitrator had to not only disregard manifest grounds for disqualification and party admissions, but also ignore the mountain of contradictory facts, including evidence that (1) Feldman and the Firm solicited to perform legal services for the Market Health Entities; (2) the Captive Agreement and other planning documents were marked with "attorney-client privilege," issued on Firm letterhead, signed by an attorney, and accompanied by Firm Billing Guidelines; and (3) the Market Health Entities were subsequently issued invoices for legal services on Firm letterhead.[87] In sum—the foundation of McCormack's opinion is a web of contradictions and misrepresentations, making it unreliable and no evidence as a matter of law.

---

[84] *See* Feldman Law Firm Interrogatory No. 1 Response attached as Ex. 15, at 6.

[85] *See* FN 83, *supra*.

[86] Ex. 5, Day 4 at 944:16 – 953:24 (James McCormack)

[87] *See* Ex. 2, Planning Memorandum at 4 (Invoice).

2032869v10
10459.002

### 7. *The Arbitrator's conclusion that the Market Health Entities' legal malpractice expert did not testify on the standard of care is patently wrong and exhibits the Arbitrator's failure to consider all evidence.*

6.39    The Arbitrator's partiality is further demonstrated by the fact that he wholly adopted McCormack's inadmissible opinions while wholly ignoring the opinions of the Market Health Entities' unbiased legal ethics expert, Professor Robert Schuwerk.  Schuwerk's opinions were based on review of relevant documents, case law, his own authoritative treatise, forty years of representing clients and advising other attorneys, and the seventeen-page summary of opinions he submitted in the record.[88] Despite Schuwerk's substantial testimony, the Arbitrator concluded that the Market Health Entities' "malpractice expert did not sufficiently establish a standard of care that Feldman failed to meet," and his opinions were summarily dismissed.

6.40    There is no basis for the Arbitrator's conclusion. Schuwerk specifically testified, *inter alia*, that Feldman and the Firm breached the standard of care by disclosing to PoolRe the Market Health Entities' privileged inquiry regarding winding down the Captives.[89] Unlike McCormack, Schuwerk opined that the Firm's disclosure was not necessary to "prevent a fraud" because: (1) although Texas law prohibits an attorney from aiding a client's fraud, the lawyer has discretion not to disclose only contemplated conduct to third parties;[90] (2) the Market Health Entities did not insist on winding down the captives and could not have done so without the Firm's assistance;[91] (3) winding down the Captives in 2012 would not have been fraud;[92] and (4)

---

[88] *See* Ex. 14, Opinions of Robert P. Schuwerk and James McCormack at ¶ 19; *see also* Ex. 5, Day 4 at 976:18 – 979:10 (Robert Schuwerk).

[89] Ex. 5, Day 4 at 1010:19 – 1017:4 (Robert Schuwerk).

[90] Ex. 5, Day 4 at 1016:16 – 1017: 4 (Robert Schuwerk).

[91] Ex. 5, Day 4 at 1013:18 – 1014:20, 1012:4 – 23 (Robert Schuwerk).

[92] Ex. 5, Day 4 at 1012:4 – 23 (Robert Schuwerk).

to the extent any fraud could occur, Feldman and the Firm should have advised the Market Health Entities of that fact, as well as other negative consequences.[93]

6.41    Additionally, the Arbitrator wholly ignored Schuwerk's other opinions offered in support of claims for (1) violations of the DTPA; (2) breach of fiduciary duties; (3) tortious interference; and (4) gross negligence.[94] Specifically, he offered a number of opinions regarding why certain agreements were unconscionable and void as against public policy.[95] To read the Award, however, one would never know this testimony occurred, as the Arbitrator could not acknowledge evidence that contradicted his contrived version of the record.

### 8.    *Conclusion: the Arbitrator was evidently partial.*

6.42    Considering all these facts as a whole, it is simply beyond discussion that the Arbitrator's biased acts, omissions, and nondisclosures—which began long before the facts were presented for his consideration—would, to an objective observer, create a reasonable impression of his partiality. *See Positive Software*, 476 F.3d at 283–84; *Tenaska Energy*, 2014 WL 2139215, at *6; *TUCO*, 960 S.W.2d at 636–37, 639. In other words, considering the circumstances in their entirety, there is nothing trivial or insubstantial about the Arbitrator's failure to disclose his and CRS's close relationship with the Feldman Entities and his prehearing decision to rule in their favor.

### F.    The Arbitrator Exceeded His Authority and Did Not Issue a Mutual, Final, and Definite Award.

6.43    The FAA provides for vacatur when the arbitrator exceeds his powers or so imperfectly executes them that a mutual, final, and definite award was not made. 9 U.S.C. §

---

[93] Ex. 5, Day 4 at 1015:12 – 1016:15 (Robert Schuwerk).

[94] Ex. 5, Day 4 at 987:2 – 988:1; 999:21 – 1005:22; 1017:12 – 1023:2; 1027:1 – 1028:21 (All Robert Schuwerk).

[95] Ex. 5, Day 4 at 996:6 – 998:15, 999:11 – 20 (Robert Schuwerk).

10(a)(4). While arbitrators enjoy broad authority to fashion remedies, they are restricted to those issues submitted. *Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.,* 607 F.2d 649, 651 (5th Cir. 1979) (citing *Retail Store Employees Union Local 782 v. Sav-on-Groceries,* 508 F.2d 500, 503 (10th Cir. 1975); *Kansas City Luggage & Novelty Workers Union, Local No. 66 v. Neevel Luggage Mfg. Co.,* 325 F.2d 992 (8th Cir. 1964)). Here, the Arbitrator (1) improperly awarded attorney's fees to the Firm on claims it lost; (2) improperly awarded attorney's fees to the Firm on a claim it did not bring; (3) entered damages against entities that were not parties to the arbitration; and (4) granted relief against parties that had no liability. Because these actions exceeded the scope of the Arbitrator's authority, the Award must be vacated.

## 1. The arbitrator improperly awarded attorney's fees for causes of action upon which the Firm lost.

6.44 The Arbitrator expressly denied the Firm's breach of contract cause of action and request for declaratory relief, finding the Market Health Entities did not breach any agreement with the Firm and it was not entitled to fees under any agreement. Only two paragraphs later, however, the Arbitrator *granted* attorney's fees to the Firm for the Market Health Entities' "breach of contract."[96] The Arbitrator exceeded his authority, showed manifest disregard for the law, and dispensed his own brand of industrial justice by creating an entirely new means for recovering attorney's fees—by simply alleging a breach of contract or declaratory judgment cause of action. Further, the Arbitrator's contradictory legal holding and fee award so confuse the final ruling that a final, definite award upon the Market Health Entities' alleged breach of contract was not made. Finally, the Arbitrator's award of attorney's fees to the Firm even when it expressly lost its underlying cause of action demonstrates the Arbitrator's continued

---

[96] Ex. 1, Award at 22 ¶¶ 3, 5, 7.

determination to multiply the Feldman Entities' recovery. This is even more egregious considering that the massive fee award in this matter appears to have been fabricated.[97]

### 2. The arbitrator improperly awarded attorney's fees for causes of action the Firm did not bring.

6.45    Similarly, the Arbitrator also held, "No express claims were made by Claimants against MH Export at the Hearing."[98] Even though no cause of action was levied regarding the IC-DISC, the Arbitrator granted Capstone all fees due or later coming due under the IC-DISC Agreement, ordering the Market Health Entities' to pay Capstone $52,000.[99] By deciding an issue that was not submitted to him and awarding fees associated with that issue, the Arbitrator exceeded his powers, mandating vacatur. *Davis v. Prudential Secs., Inc.,* 59 F.3d 1186, 1194-5 (11th Cir. 1995).

### 3. The Arbitrator improperly entered relief against individuals and entities that were not parties to the arbitration proceeding.

6.46    An arbitrator exceeds his authority when he grants relief or sanctions against a nonparty not bound to the arbitration. *See e.g. Millmaker v. Bruso,* CIVA H-07-3837, 2008 WL 4560624, at *4  (S.D. Tex. Oct. 9, 2008) (vacating an award that sanctioned a nonparty, regardless of the reprehensibility of his conduct). Nevertheless, the Arbitrator purported to bind to the Award "each and every person controlled by, controlling or under common control with or benefitting from (e.g. an owner, partner, joint venturer, member or shareholder) any of the

---

[97] *See e.g.* Ex. 5, Day 2 at 312:9 – 17 (Robert LSnyder, the corporate representative for PoolRe, testified that despite PoolRe's claim for attorney's fees, as of the second day of the hearing, he has not seen a single bill for attorney's fees); *see also,* Ex. 5, Day 5 at 1262:16 – 21 (John Craddock, the Feldman Entities' expert on attorney's fees, testified on the final day of the hearing that the legal bills in this matter had just been printed for the first time and mailed to clients within the "last few days.")

[98] Ex. 1,  Award at 5 ¶3.

[99] Ex. 1, Award at 23 ¶5; 26

2032869v10
10459.002

Parties to this arbitration, each such person considered in privity."[100] He therefore sought to cause persons and entities that were not represented at the Hearing to become responsible for payment of the Award and to be subject to the Award's preclusory effects, in violation of every notion of due process or substantial justice. The Arbitrator had no authority to bind entities that were not parties to the arbitration and were not on notice of or represented at the Hearing. He further had no authority to deliver rulings on issues of privity that were not submitted for his determination. *See Davis*, 59 F.3d at 1195. The Arbitrator's overreaching to even unknown parties again evidences his aim to ensure full award funding to the Feldman Entities by securing even non-parties as payment sources.

### 4. *The Arbitrator granted relief against parties with no liability.*

6.47    The Arbitrator ordered "David Rivero, Gary McNelley, Market Health, Inc., Nutrition Casualty Corp., and Solution Casualty Corp., jointly and severally pay to Capstone Associated Services, Ltd. under the IC-DISC contract the sum of fifty two thousand Dollars ($52,000)." Despite this ruling, however, there is no evidence in the record to show Nutrition and Solution signed the IC-DISC Agreement or were in any way obligated to pay for services rendered to MH Export. The Feldman Entities maintained the IC-DISC Agreement for MH Export, and an entirely separate contract related to Nutrition and Solution, the Captive Agreement. Nutrition and Solution are not parties to the IC-DISC Agreement, have no privity with MH Export, were not rendered any services under the IC-DISC Agreement, and did not even exist when the IC-DISC Agreement was formed. There is no basis for Nutrition and Solution to pay a single cent for services rendered to MH Export, and this inescapable problem renders the Award so imperfect that a final, definite award was not rendered. 9 U.S.C. § 10(a)(4).

---

[100] Ex. 1, Award at 28.

2032869v10
10459.002

# VII. CONCLUSION & PRAYER

Defendants Market Health, Inc., Gary McNelley, David Rivero, MH Export Corp., Nutrition Casualty Corp., and Solution Casualty Corp. ask that the Award be vacated or, in the alternative, modified for the reasons set forth above. Further, should the Court find that a valid arbitration agreement exists between the parties and refer the parties to arbitration. Defendants ask that the matter be referred to the American Arbitration Association rather than Conflict Resolution Systems, PLLC to prevent any potential partiality or undue prejudice.

Respectfully submitted,

THOMPSON, COE, COUSINS & IRONS, L.L.P.

By: */s/ William R. Moye*
  William R. Moye
  *Attorney-In-Charge*
  State Bar No. 24027553
  Southern District of Texas No. 34007
  One Riverway, Suite 1400
  Houston, Texas 77056
  (713) 403-8389; Fax  (713) 403-8299

**ATTORNEY FOR DEFENDANTS**

OF COUNSEL:
Kevin F. Risley
State Bar No. 16941200
Southern District of Texas No. 3491
One Riverway, Suite 1400
Houston, Texas 77056
(713) 403-8389; Fax (713) 403-8299

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been sent to all known counsel of record and/or parties of record at the addresses listed below by way of the CM/ECF system on the June 6, 2014.

*Via CM/ECF*
L. Andy Paredes
Texas Bar No. 00788162
1980 Post Oak Blvd., Suite 1975
Houston, Texas 77056
(713) 850-0550; Fax: (713) 600-0066
**Attorney for PoolRe and Capstone**

*Via CM/ECF*
John R. Craddock
Texas Bar No. 04969800
1980 Post Oak Blvd., Suite 1900
Houston, Texas 77056
(713) 850-0700; Fax (713) 850-8530
**Attorney for the Firm**

*/s/ William R. Moye*
WILLIAM R. MOYE

## INDEX OF EXHIBITS

| Ex. No. | Document |
|---------|----------|
| 1 | Arbitration Award |
| 2 (R1.1) | Planning Memorandum (10-5-11) |
| 3 | IC-DISC Agreement (11-1-11) |
| 4 | Engagement letter for Formation and Administration of a Captive Insurance Program (11-7-11) |
| 4A | Client Information: Guidelines on Firm Administration & Billing |
| 4B | Respective Duties and Responsibilities of Forming and Operating Captive Insurer |
| 4C | Capstone Services Agreement |
| 4D | Tax Risks and Responsibilities Under IRC §831(b) |
| 4E | Market Health, Inc. Brief Comparison of Types of Captives |
| 5 | Arbitration Hearing Transcript |
| 6 (R37.25) | November 2011 E-mails Regarding Captive Insurance Engagement Letter |
| 7 (R38.104) | December 2012/January 2013 E-mails Regarding Captive Insurance Companies |
| 8 (R21) | General Change Endorsement |
| 9 | Client Information: Guidelines on Firm Administration & Billing" |
| 10 | Brief on the Unenforceability of the Arbitration Provision |
| 11 | Order of Consolidation of Arbitrations |
| 12 | Declaration of William R. Moye |
| 13 (R40.1) | Arbitration Demand (3-6-13) |
| 14 (R88) | Opinions of Robert P. Schuwerk, McCormack Opinions Regarding Schuwerk Opinions, and Schuwerk Response to McCormack Opinions |

2032869v10
10459.002

15 (R43.1)     The Feldman Law Firm's Response to Interrogatory No. 1

16             Agreed Judgment

17 (R87)       Letter from State Bar of Texas to Stewart Feldman (8-26-04)

18 (R89)       Letter from James McCormack to State Bar of Texas (9-21-05)

19             Claimants' Joint Post-Hearing Submission

20             Claimants' Final Arbitration Award